**29**

1 WALTER WILHELM LAW GROUP
A Professional Corporation
2 Riley C. Walter #91839
Kathleen D. DeVaney #156444
3 Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
4 Fresno, CA 93720
Telephone:   (559) 435-9800
5 Facsimile:    (559) 435-9868
E-mail:        rileywalter@w2lg.com
6

7 Chapter 9 Counsel

8                 IN THE UNITED STATES BANKRUPTCY COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10                              FRESNO DIVISION

11 In re                                    CASE NO.  17-13797

12 TULARE LOCAL HEALTHCARE            Chapter 9
   DISTRICT, dba TULARE REGIONAL
13 MEDICAL CENTER,

14          Debtor.

15 _____          Adv. No.:  17-01095-B

16 HEALTHCARE CONGLOMERATE            DC NO.:  OHS-1
   ASSOCIATES, LLC,
17                                            **OPPOSITION OF TULARE LOCAL**
                Plaintiff,                    **HEALTHCARE DISTRICT TO MOTION**
18     v.                                     **TO REMAND LAWSUIT TO STATE**
                                              **COURT**
19 TULARE LOCAL HEALTHCARE
   DISTRICT, dba TULARE REGIONAL         Date:      April 12, 2018
20 MEDICAL CENTER; DOES 1 through       Time:      9:30 a.m.
   20,                                   Place:     2500 Tulare Street
21                                                  Fresno, CA  93721
                Defendants.                         Courtroom 13
22                                       Judge:     Honorable René Lastreto II
23

24      Tulare Local Healthcare District (the "District") respectfully submits this

25 opposition to the motion ("Motion") filed by Healthcare Conglomerate Associates, LLC

26 ("HCCA") to remand a lawsuit ("Lawsuit") that HCCA filed against the District in the

27 Superior Court of the State of California for the County of Los Angeles ("LA Superior

28 Court").

                                        -1-

Opposition of Tulare Local Healthcare District to Motion to
Remand Lawsuit to State Court                    M:\S-U\TRMC\PLEADINGS\OHS-1  Motion to
                                                 Remand\oppo.031918.gaa.V3.docx

## I.    SUMMARY OF ARGUMENT

HCCA's claims and the District's counterclaims alleged in the Lawsuit form the center of, and are inextricably intertwined in, a web of litigation pending, and to be pending, in this Court.  The claims and counterclaims are also at the heart of the District's chapter 9 case and its ability to reorganize and move forward through a plan of adjustment. A debtor's ability to remove litigation pending in state and federal courts in different and far flung locations into the centralized forum of a bankruptcy court is one of the primary objectives and purposes of the Bankruptcy Code, and allows for the efficient adjudication of claims concerning a debtor's liability to its creditors as well as a debtor's claims against its creditors.

HCCA's Motion should be denied because: (1) this Court has subject matter jurisdiction over the claims and counterclaims in the Lawsuit, venue is proper in this Court and removal of the Lawsuit directly to the bankruptcy court does not require remand; (2) remand to the LA Superior Court is not required by any forum selection clause; (3) any right to a jury trial that HCCA may have on its claims, if any, does not require remand; (4) equitable and efficiency factors favor that the Lawsuit remain in this Court; and (5) remand is not warranted because bankruptcy courts routinely interpret state law in adjudicating claims and disputes between parties.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

The procedural history and facts are important to understand how the disputes between the District and HCCA at issue in the Lawsuit are at the heart of the District's chapter 9 case and at least two other adversary proceedings[1] pending in this Court.[2]

///

---

[1] Those adversary proceedings are Case Nos. 18-01005 and 18-01008. Other adversary proceedings are to be filed by the District.

[2] The District was not aware of certain facts set forth in this section until various points after the petition commencing this chapter 9 case was filed because HCCA had control of the District's books, records and facilities until on or around November 22, 2017. The District is still in the process of reviewing its books and records related to HCCA's conduct as the former manager of the Hospital and other facilities of the District. Other records needed by the District are presently in the possession of the Tulare County District Attorney pursuant to search warrants served upon HCCA.

## A.    The Parties to the Lawsuit

### 1.    The District

The District is a public local healthcare district organized under the Local Hospital District Law set forth in California's Health and Safety Code. It is governed by a Board of Directors consisting of five elected or appointed persons residing in specific electoral zones of the District (the "Board"). Pursuant to the District's Bylaws, the officers of the District must be members of the Board and are elected by the Board members.

The District operates a general acute hospital facility (the "Hospital"),[3] clinics, a laboratory, a fitness facility (called Evolutions Fitness), and other patient services programs. The District serves the needs of over 70,000 residents of the City of Tulare and the surrounding rural communities, including Woodville, Tipton, Pixley and Waukena. It is bisected by Highway 99, a heavily traveled freeway in the San Joaquin Valley, and many tens of thousands of travelers potentially require emergency medical care due to accidents or illnesses in transit through the District's geographical boundaries on any given day. The District's residents are all located in Tulare County, which has one of the highest percentages of people living in poverty and the lowest amount of per capita income in the State of California.

### 2.    Healthcare Conglomerate Associates, LLC

Healthcare Conglomerate Associates, LLC is a limited liability company organized in December 2013 under the laws of the State of California. HCCA was organized by Bruce Greene, an attorney with the law firm of BakerHostetler LLP ("BakerHostetler"). Request for Judicial Notice ("RJN"), Ex. 1. Yorai Benzeevi, M.D. ("Benzeevi"), a Visalia resident, is the manager and/or member of HCCA and the Chief Executive Officer of HCCA. RJN, Ex. 2. Allan W. Germany ("Germany") was and/or is the Chief Financial Officer and Chief Operating Officer of HCCA. HCCA's website lists

---

[3] The Hospital is located at 869 Cherry Street in Tulare and is known as the Tulare Regional Medical Center. The license is currently under voluntary suspension and no patients are being cared for. A skeleton crew is currently on the job attending to administrative matters.

869 Cherry Street in Tulare as its address as of the date of the filing of this Opposition.[4]
Ex. 3 to RJN.

### B.     The Contract at Issue in the Lawsuit and Events Leading to the Filing of the Petition

On May 29, 2014, HCCA and the District entered into a contract involving four agreements consisting of a Management Services Agreement ("MSA"), Interim Joint Operating Agreement, Joint Operating Agreement and Option (collectively, the "Contract").[5]  Pursuant to the MSA, HCCA was retained as the manager of the Hospital and other facilities through which the District provides services to its residents.  Over time, the relationship between the District and HCCA seriously deteriorated as questions and issues surfaced concerning HCCA's performance of its obligations under the Contract, including financial mismanagement and other improprieties[6] and the residents voters and tax payers of the District grew dissatisfied with the governance of the District. *See*, Dkt. Nos. 34 and 104.

///

///

---

[4] In February 2017, HCCA changed the address of its principal office to 10940 Wilshire Blvd., Suite 1600, Los Angeles, California 90024. RJN, Ex. 4. The current Wilshire address for HCCA is the same address of Premier Business Centers, a company which provides a "virtual address" for businesses to use at that location for a monthly fee. RJN, Ex. 5. Thus, HCCA's "office" in Los Angeles appears to be a "virtual" one, not one where actual business is conducted or assets are held.

[5] Copies of the documents that comprised the Contract were filed in the District's Chapter 9 case as Dkt. Nos. 37, 38, 39 and 40, respectively, and as Exhibit 2 to the Declaration of Yorai Benzeevi filed on October 17, 2017.

[6] These questions and issues include, but are not limited to: (a) failing to provide financial and other information requested by members of the District's Board; (b) concerns expressed by EideBailey, the District's independent auditor, respecting HCCA's lack of financial and internal controls set forth in the District's audit for the fiscal year ending June 30, 2016; (c) machinations to prevent the seating of duly elected Board member Senovia Gutierrez; (d) providing inaccurate and/or incomplete information to the District's Board respecting the District's financial health; (e) taking actions in contravention of the best interests of the District and its residents and HCCA's obligations under the Contract; and (f) transfers and/or loans of the District's assets to Southern Inyo Hospital, which was also managed by HCCA at that time. (Southern Inyo filed for chapter 9 protection and filed a motion to terminate HCCA's management and reject the Contract.  The motion was granted.  In a subsequent pleading Southern Inyo asserted claims of mismanagement similar to those raised by the District). Additional concerns relate to (a) sales of assets of the District after authority was revoked; (b) depositing asset sale proceeds into a non-District account; (c) misuse of bond proceeds; and assertion of an unauthorized deed of trust against the District's assets.

-4-

### 1. The Petition to Recall Former District Board Member Kumar and the November 2016 Election of Two New Board Members

In or around September 2016, citizens of the District started collecting signatures for a petition to recall former Board member Parmod Kumar, M. D. ("Kumar"). Kumar had served on the Board since in or around 1994 and served as president of the Board for many years. The petition to recall Kumar was filed in or around late September 2016. Kumar was perceived to be a close ally and staunch supporter of Benzeevi and HCCA. The proponents of the recall petition were dissatisfied with Kumar's vote to hire HCCA as manager and Kumar's failed oversight of the use of $85 million in general obligation bond proceeds[7] approved by voters in 2005 (the "Bond Proceeds") intended to construct a new medical tower at the Hospital (the "Tower Project") and purchase equipment.

In November 2016, the District conducted an election for two seats on the Board. At that time, Kevin Northcraft ("Northcraft") and Michael Jamaica ("Jamaica") were elected by the District's voters to serve on the Board. Northcraft and Jamaica ran on a campaign platform insisting on transparency, accountability and close scrutiny of HCCA's management of the Hospital and other facilities. HCCA, Benzeevi and Germany perceived that campaign platform and subsequent election of Northcraft and Jamaica to be adverse to their economic interests under the unfavorable Contract. HCCA, Benzeevi and Germany also believed that if the District's voters recalled Kumar, a majority of the District's new Board would insist on transparency, accountability and closer scrutiny of HCCA's management of the District's Hospital and other assets and related patient service programs.

### 2. The Formation of Another Benzeevi Company, Tulare Asset Management

A few weeks after the petition to recall Kumar was filed and just prior to the November 2016 election, Bruce Greene of BakerHostetler, who was simultaneously

---

[7] The Joint Legislative Audit Committee, at the request of State Senator Jean Fuller (R-Bakersfield), recently unanimously voted to audit the use and expenditure of the Bond Proceeds and the audit is underway.

counsel for HCCA and the District, and his firm was counsel for Southern Inyo Healthcare District, executed Articles of Organization of a limited liability company named Tulare Asset Management, LLC ("Tulare Asset Management"). Tulare Asset Management's Articles of Organization were filed on October 31, 2016 in the office of the Secretary of State of the State of California as document number 201630910116.[8] The business address of Tulare Asset Management listed in such Articles of Organization is a residence on Lakewood Drive in Visalia, California, which is believed to be Benzeevi's residence in this judicial district. Thus, it appears that Benzeevi conducted the business of Tulare Asset Management from his residence in Visalia.

### 3. The July 2017 Recall Election and HCCA's Efforts to Prevent the New Duly Elected Board Member from Serving on the Board

After the November 2016 election, the District's Board consisted of Kumar, Jamaica, Northcraft, Linda Wilbourn ("Wilbourn"), and Richard Torrez ("Torrez"). Wilbourn served as President of the Board. Kumar, Wilbourn and Torrez were perceived to be close allies and supporters of Benzeevi and HCCA. The petition to recall Kumar was successful by a wide margin and an election to fill the vacancy for July 11, 2017 as set forth in Board Resolution No. 852 dated April 10, 2017.

A few weeks before the July 11, 2017 recall election, HCCA convened a special meeting of the District's Board and proposed that HCCA be authorized to borrow up to $22 million to fund operational expenses (including costs relating to the Tower Project, repayment of indebtedness, and for other hospital purposes). A special board meeting was held on June 20 to consider HCCA's request, and the Board voted 3-2[9] to approve the request. The resolution prepared by the District counsel, BakerHostetler, approving that motion was given the duplicate number of Resolution No. 852 ("Resolution No. 852").

---

[8]RJN at Ex. 7.
[9]Northcraft and Jamaica voted against the proposed resolution.

A special election was held on July 11, 2017, and the District's voters recalled Kumar with roughly 81% of the votes cast in favor of recall.  In that same special election, Senovia Gutierrez ("Gutierrez") was elected to replace Kumar by receiving roughly 76% of the votes cast. On July 20, the Tulare County Elections Office certified the results of the July 11 special election. Notwithstanding the overwhelming percentage of votes in favor of his recall, Kumar requested that a recount take place but then failed to timely deliver payment for the recount on the day it was scheduled to take place. A recount eventually did take place which confirmed the fact that Kumar was recalled by a landslide.

On July 25, 2017, Gutierrez took the Oath of Office to serve as a member of the District's Board.  On or about July 26, Michael Allan, an attorney representing Kumar, sent  a letter to the District's Board asserting that the Board would commit a violation of the Ralph M. Brown Act ("Brown Act") if the Board recognized Gutierrez as a Board member and demanded that the Board cease and desist from recognizing her.

On July 26, 2017, at the Board's regularly scheduled meeting, Wilbourn, acting in her capacity as the Board's President and in contravention of the will of the voters of the District, refused to recognize Gutierrez as a Board member.  Wilbourn relied on the opinion of HCCA's counsel, Bruce Greene of BakerHostetler, who, at that time, was also counsel for the District, to justify her refusal to recognize Gutierrez as a Board member. Wilbourn took this position notwithstanding the fact that (a) the Tulare County Elections Office had certified the result of the special election on July 20, 2017; (b) such certification was made available to the Board; and (c) Gutierrez had taken the oath of office on July 25. Wilbourn then unilaterally canceled the July 26 Board meeting. Notwithstanding Wilbourn's decision to unilaterally cancel the July 26 Board meeting, Board members Northcraft, Jamaica and Gutierrez constituting a majority of the Board conducted a meeting and scheduled a special meeting to be held on July 27, 2017. Late in the evening of July 26, Bruce Greene of BakerHostetler, acting as counsel for HCCA

-7-

1   and the District, stated that the District would not recognize any action taken at the July

2   27 Board meeting.

3           On July 27, 2017, the District conducted a special Board meeting.  At that July 27

4   special Board meeting, the Board by a 3-0 vote approved the following motions to,

5   among other things: (a) rescind Resolution No. 844 pursuant to which HCCA had the

6   authority to engage legal counsel; (b) rescind Resolution No. 851 and Resolution No.

7   852 regarding HCCA's authority to seek loans; (c) terminate BakerHostetler as counsel

8   for the District; (d) retain the law firm of McCormick Barstow as counsel for the District;

9   and (e) schedule a special meeting to be held on August 9, 2017.  Board members

10  Wilbourn and Torrez did not attend that meeting.

11          On the late evening of July 28, 2017, in an email sent to Northcraft, Bruce

12  Greene stated that, acting in his claimed capacity as counsel for the District, it was his

13  opinion that the special meeting held on July 27 was invalid and that Gutierrez was not

14  a member of the Board. He further threatened that Northcraft, Gutierrez and Jamaica

15  were "risking personal liability" for conducting such Board meetings and that "there will

16  be no insurance coverage or indemnification rights under the District's Bylaws" in the

17  event of litigation.  On Sunday, July 30, 2017, Greene reiterated these positions in

18  another email to Northcraft.

19          On August 9, 2017, the District held a special meeting of the District's Board. At

20  the August 9 special meeting, the Board approved by a 3-0 vote the following motions

21  to, among other things: (a) declare the July 11, 2017 recall election results; (b) appoint

22  certain Board members as officers; and (c) remove all Hospital board officers. Board

23  members Wilbourn and Torrez did not attend that meeting.

24          In addition, August 9, 2017, Marshall Grossman, an attorney with the law firm of

25  Orrick, Herrington & Sutcliffe ("Orrick"), transmitted a letter to Board members

26  Northcraft, Jamaica and Gutierrez on behalf of his clients, Benzeevi and HCCA.[10]  In the

---

[10] As the law firm of BakerHostetler firm then also represented HCCA, HCCA was now represented by both Orrick and BakerHostetler.

-8-

August 9 letter, Orrick asserted, *inter alia*, that the District Board meetings were "falsely billed" as official District Board meetings. Orrick demanded and threatened, among other things, that Northcraft, Jamaica and Gutierrez "cease and desist" from conducting the Board meetings "given the potential for litigation to which you may be a party."

On August 23, 2017, a regular meeting of the Board was scheduled to take place. That very same day, Wilbourn transmitted a letter to Bruce Greene resigning from her position as the Board member of Zone 5 of the District as of noon that day. In an email to Northcraft transmitted late in the afternoon of August 23, Greene stated that Wilbourn (who had already resigned) and Torrez were not available to attend the Board meeting and it would be canceled. Despite HCCA and Greene's efforts to interfere with and stop the Board from conducting a meeting, the Board met on August 23 to conduct the District's business.

On August 24, 2017, the McCormick law firm, acting as counsel for the District, transmitted a letter to Greene and John Cermack, Jr. of BakerHostetler that, among other things, reiterated the fact that the District had previously terminated BakerHostetler as counsel for the District and reminded them of the District's request made on August 3, 2017 that BakerHostetler promptly turnover the District's files and electronic records as required by Rule 3-700 of the Rules of Professional Conduct. On August 28, Peter James of BakerHostetler responded to McCormick's August 24 letter and refused to comply with the District's request based on BakerHostetler's position that Gutierrez was not a member of the Board and so the Board could not meet to terminate BakerHostetler.

**4.    HCCA Expedites Its Efforts to Obtain Loans Despite the Board's Decision to Rescind Resolution No. 852 at the July 27 Special Meeting**

While HCCA was (1) hard at work attempting to interfere with District governance and prevent the District from conducting any Board meetings and unsuccessfully obstructing Gutierrez from being seated as an elected member of the Board and (2) with

-9-

1 the knowledge that the Board had rescinded any authorization HCCA may have had to

2 borrow money in the District's name, HCCA expedited its efforts to obtain loans in the

3 District's name secured by District assets and sell District assets under a

4 "sale/leaseback" financing arrangement.

5       In or around late July of 2017, after being fully aware of the District's

6 dissatisfaction with HCCA, Germany, acting in his capacity as the CFO/COO of HCCA,

7 began discussions with an entity called Celtic Leasing Corporation ("Celtic Leasing") to

8 obtain a loan or financing in an amount as high as $20 million. Germany, on behalf of

9 HCCA, pursued a loan or financing with Celtic Leasing despite his knowledge that on

10 July 27, 2017, the District's Board had voted to rescind Resolution No. 851 and

11 Resolution No. 852 regarding HCCA's authority to seek loans on behalf of the District.

12       In fact, on or about July 28, 2017, in pursuit of a loan or financing arrangement,

13 Germany transmitted an email to Timothy Ong of Celtic Leasing which stated: "The

14 critical factor for me is time. I would like to get this funded very quickly. Thank you."

15 HCCA was desperate to close a financing transaction as fast as possible because

16 HCCA knew that: (a) the Board had rescinded Resolution No. 852; and (b) HCCA and

17 Benzeevi's efforts to obstruct Gutierrez from her rightful position on the Board as the

18 duly elected Board member in the recall election would not be successful.

19       Despite the lack of authority to sell any District assets, pledge District assets as

20 collateral for any loan or enter into any other type of agreement for the sale and

21 leaseback of District assets, Benzeevi and Germany orchestrated a transaction with

22 Celtic Leasing Corp. ("Celtic") and MB Financial, a national banking association ("MB

23 Financial") to (a) sell personal property assets of the District to Celtic for the sum of

24 $3,000,000; (b) obligate the District to lease that personal property back from Celtic for

25 the sum of $82,026.00 per month; and (c) direct Celtic to wire transfer the $3,000,000 in

26 proceeds from the sale of District assets to the bank account of Tulare Asset

27 Management, which was owned and controlled exclusively by Benzeevi (the "Celtic

28

-10-

Transaction").[11]  In connection with the Celtic Transaction, on August 28, 2017, BakerHostetler, acting as "special counsel" to HCCA, not the District, provided Celtic with an opinion letter with respect to the sale and leaseback of the District's assets to Celtic. On August 25, 2017, Michael Allan (the same attorney that represented Kumar and sent a "cease and desist" letter to the Board threatening the Board if it recognized Gutierrez as a duly elected Board member) provided BakerHostetler as HCCA's counsel with an opinion letter respecting Gutierrez's qualifications as a Board member on which the District believes Celtic and MB Financial relied in order to proceed with the Celtic Transaction.

> ### 5.     HCCA Directs the $3,000,000 in Loan Proceeds from the Sale of District Assets to be Wired To The Bank Account of Benzeevi's Company, Tulare Asset Management

HCCA provided Celtic with wire transfer instructions to wire the sum of $3,000,000 to the account of Tulare Asset Management, LLC, Attn: Accounts Receivable, which Benzeevi operated out of his residence in Visalia.  On August 31, 2017 and prior to the wire being sent, Celtic requested that Germany confirm that the address "for the Tulare Asset Management Account" was the same address as the District's Hospital address at 869 N. Cherry Street, Tulare, CA 93274. Germany represented that the address of Tulare Asset Management was the same as the District's address by stating to Celtic in a written communication that "Yes, this is the same address."

Germany, however, knew that Tulare Asset Management did not do business at 869 N. Cherry Street, Tulare, CA and was not authorized to use the District's Hospital address in any manner whatsoever.  If Germany had provided Celtic with the registered

---

[11] The documentation related to this transaction is appended to the Complaint in Adversary No. 010008. Germany also attempt to obtain a loan of about $7 million from Leasing Innovations secured by the District's real and personal property, but was unable to do so before the District filed its petition. However, Leasing Innovations placed liens on the District's real and personal property assets in advance of the transaction closing, and the District's counsel was forced to spend time and money to remove such liens. As of the date of this Opposition HCCA has not provided the District with documentation as to how HCCA spent the $3,000,000.

-11-

1  address of Tulare Asset Management on Lakewood Drive in Visalia on file with the

2  California's Office of the Secretary of State, Celtic may have been suspicious of the wire

3  transfer instructions and not wired to Tulare Asset Management the $3,000,000 in

4  proceeds from the unauthorized sale of the District's assets.  On August 31, 2017, MB

5  Financial wire transferred from Illinois the $3,000,000 in proceeds from the unauthorized

6  sale of the District's assets into the account of Tulare Asset Management.  At no time

7  did the District have any relationship with, contract with or control over Tulare Asset

8  Management or authority over or control of the funds in any bank account of Tulare

9  Asset Management.  In fact, the District had no knowledge as to the existence of this

10  HCCA account.l

11      By on or around September 13, 2017, roughly two weeks after receiving the

12  $3,000,000 in proceeds of the unauthorized sale of the District's assets to Celtic,

13  Benzeevi had caused the $3,000,000 to be withdrawn and transferred from the Tulare

14  Asset Management bank account.[12]

15

16  **6.    HCCA Files The Lawsuit And Notifies the District That It Deems Itself "Insecure"**

17      Two days after completing the process of transferring the $3,000,000 out of the

18  Tulare Asset Management bank account, HCCA filed the Lawsuit on September 15, 2017

19  in the LA Superior Court.  The Lawsuit alleges, *inter alia*, that the District owed HCCA the

20  principal amount of $7 million for loans HCCA allegedly advanced to the District for which

21  "HCCA has received promissory notes."  That same day, HCCA sent the District a notice

22  stating that it deemed itself "insecure" and demanded that the District provide it with an

23  irrevocable Letter of Credit from a U.S. banking institution acceptable to HCCA ("HCCA

24

---

25  [12] On October 4, 2017, after having received the $3,000,000, Benzeevi, acting in his capacity as the
    manager of Tulare Asset Management, LLC, filed an LLC-12 Statement of Information with the office of

26  the Secretary of State of the State of California changing the street address of Tulare Asset Management,
    LLC from Benzeevi's residence on Lakewood Drive in Visalia, California, to 869 N. Cherry Street, Tulare,

27  CA (the address of the District's Hospital).  However, the LLC-12 Statement of Information filed by
    Benzeevi did not change the mailing address of Tulare Asset Management, which remained at the

28  address of Benzeevi's residence on Lakewood Drive in Visalia, CA.

Notice").

It was not until on or about September 26, 2017, that HCCA and Benzeevi abandoned their efforts, by and through their attorneys, to unsuccessfully block and prevent Gutierrez from serving on the Board after the intervention of the Tulare County Superior Court.

### 7. HCCA Grants Itself a Lien on the District's Real Property And Then Notifies the District That It Is in A Dire Fiscal Crisis

Given HCCA's total and complete control over all aspects of the District's financial information under the MSA, HCCA knew and understood that the District was in severe fiscal distress but failed to inform the District's Board of the scope and extent of the District's financial condition. Instead, armed with this inside knowledge of the District's dire financial straits and with the filing of a chapter 9 petition likely imminent, Benzeevi, claiming to be the Chief Executive Officer of the District, not in his capacity as Chief Executive Officer of HCCA as manager of the District, recorded a deed of trust encumbering the Evolutions Plaza property owned by the District.[13] Specifically, on September 28, 2017, HCCA recorded a Short Form Deed of Trust ("Deed of Trust") executed by Benzeevi on September 27, 2017, claiming to be the Chief Executive Officer of the District, in favor of Benzeevi's company, HCCA, which purports to secure a series of ten promissory notes not previously disclosed to the Board. The Deed of Trust bears the words "OHSUSA" in the footer which appears to indicate that it is a document prepared by Orrick. The ten promissory notes referenced in the Deed of Trust are dated beginning in July 2015 through July 2017 in the amount of $10,233,950.05. The $10.2 million obligation alleged in the ten promissory notes is (a) roughly $3.2 million more than HCCA alleged it was owed in a letter Benzeevi sent on the exact same date; and (b) alleged due in the Lawsuit. The Deed of Trust was recorded in the Official Records of Tulare County as document no. 2017-0059339 and purports to encumber the Evolutions

---

[13] The execution and recordation of the Deed of Trust are the subject of adversary proceeding no. 01005.

-13-

1  Plaza property owned by the District.  The District disputes the validity of the Deed of
2  Trust, any lien created by the recordation of the Deed of Trust and the amount of the
3  obligation allegedly secured by the Deed of Trust.

4      On the same day it recorded the Deed of Trust, HCCA requested in writing that the
5  Board conduct an emergency meeting on Sunday, October 1, 2017 (the "Benzeevi
6  Letter"). Docket No. 115 at pp. 160-61 (emphasis in original).   In the Benzeevi Letter,
7  HCCA advised for the first time that the District: (a) had a "CRITICAL liquidity crisis," (b)
8  was "COMPLETELY out of cash," (c) many vendors were threatening to cease providing
9  goods and services, and (d) it lacked "sufficient cash to fund the entire gross payroll." *Id.*
10 HCCA also alleged it was owed $7 million and would not extend further credit to the
11 District. HCCA further stated that it had notified the California Department of Public Health
12 ("CDPH") that day of "the District's inability to fund payroll." *Id.* Finally, Benzeevi wrote
13 "[w]ithout immediate approval for the District to obtain prompt funding, the only alternative
14 will be for HCCA to move immediately to cease operations at the Hospital and to consider
15 immediately a plan over the next several days to cease operations at the Hospital." *Id.*

16
17     **C.**    **The District Files Its Petition to Save the Hospital And Moves to
   Reject The Contract At Issue In the Lawsuit**

18     Given (a) the District's admitted insolvency and its inability to fund payroll and pay
19 other obligations as and when they became due, (b) HCCA's threat to cease operations
20 at the hospital and medical facilities thereby creating a health and safety emergency for
21 patients and the public seeking medical care, and (c) the likelihood that the CDPH might
22 involuntary suspend the District's license, the District commenced this Chapter 9 case on
23 an emergency basis by filing a voluntary petition on Saturday, September 30, 2017 (the
24 "Petition Date"). Given these dire circumstances and with no ability to obtain adequate
25 funding on an urgent basis, thereafter, the District temporarily suspended operations
26 effective midnight on October 28, 2017 and voluntarily surrendered its license to the
27 CDPH to avoid a forced shut down.

28

-14-

1    In light of the irreparable relationship between the District and HCCA, the District

2  filed a motion to reject the Contract.  Over the course of an intense two week period

3  beginning on or about October 10, voluminous pleadings were filed by both HCCA and

4  the District in connection with the District's motion to reject the Contract. The District's

5  motion was granted on October 19, 2017.  Although the order was entered on November

6  2 ("Rejection Order"), HCCA was not required to turnover possession until November 22,

7  2017. Dkt No. 174.

8    On or about November 16, 2017, the Tulare County District's Attorney's Office,

9  with the assistance of the Tulare Police Department, served a search warrant on HCCA

10  and seized documents and information from District facilities pursuant to such warrant.[14]

11  At this point, the District does not have access to the documents and information seized

12  under the search warrant.  The District did not gain control of its facilities, documents,

13  information and computer systems until approximately November 22, 2017 at 5:00 p.m.,

14  the day prior to Thanksgiving.

15
16  **D.    The District Files Its List of Creditors, HCCA Files Its
       Notice of Appearance as a Creditor and Notice of Secured Claim**

17    On October 9, 2017, HCCA filed its notice of appearance as a creditor in this

18  chapter 9 case. Dkt. No. 24. On October 27, the District filed its initial list of creditors

19  and  listed HCCA as a creditor with a disputed claim. Dkt. No. 154 at p. 7. On November

20  14, HCCA filed its "Notice of Secured Claim of Healthcare Conglomerate Associations,

21  LLC" and asserted that its claim in this chapter 9 case is secured by a security interest

22  in the District's accounts receivable generated on or before the Petition Date and in the

23

24

---

25  [14]  HCCA's counsel, Martin Grossman, was quoted in a November 16, 2017 news article opining that the
    Tulare County District Attorney is "under the thumb of the District." The actual reality is that the District
26  has no control over the actions and investigations conducted by law enforcement agencies, including the
    Tulare County District Attorney or the United States Attorney, and has no access to the documents and
27  information seized under the search warrant.  HCCA's malfeasance may extend much further than the
    District is aware of at this time. Search warrants were also served upon Southern Inyo Healthcare District
28  relating to the District's assets.

-15-

1  proceeds of those accounts, including but not limited to funds deposited into the

2  District's accounts at the Bank of Sierra. Dkt. No. 204.

3

4  **E.   The District Removes the Lawsuit to this Court, Files An Answer and Counterclaim, and HCCA Files its Motions to Remand and Strike or Dismiss the Counterclaim**

5

6  On December 28, 2017, the District filed its Notice of Removal ("Removal

7  Notice") and removed the Lawsuit directly to this Court. Adv. P. Dkt. No. 1. That same

8  day, the District also filed its Answer and a Counterclaim against HCCA  alleging eleven

9  separate claims against HCCA. Adv. P. Dkt. Nos. 8-12.  HCCA has filed motions to

10  dismiss and strike the Counterclaim which are scheduled for hearing at the same time

11  as the Motion. Adv. P. Dkt Nos.  21-29.

12  HCCA's Lawsuit involves matters in this chapter 9 case and two adversary

13  proceedings including: (a) the adjudication of facts and issues in the Adversary

14  Proceeding No. 18-01005 respecting the existence and amount of any claim HCCA may

15  have under the promissory notes referenced in the Deed of Trust; (b) the adjudication of

16  facts and issues related to any claim HCCA may have against the District for allegedly

17  breaching the Contract, the scope of any security interest in the District's accounts

18  asserted by HCCA in its Notice of Secured Claim and whether HCCA lawfully deemed

19  itself "insecure" under the Contract; and (c) the adjudication of facts and issues in

20  Adversary Proceeding No. 18-01008 respecting the events surrounding the election of

21  Northcraft and Jamaica to the Board, the recall election in which Gutierrez was elected

22  to the Board and the authority or lack thereof to borrow funds or sell District assets in

23  connection with the Celtic Transaction.

24  Similarly, the District's Counterclaim involves matters at issue in this chapter 9

25  case and two adversary proceedings including: (a) the facts requiring equitable

26  subordination of any claim HCCA may have against the District in the chapter 9 case;

27  (b) facts supporting the District's position that the Deed of Trust at issue in Adversary

28

-16-

1 Proceeding No. 18-01005 should be cancelled which is essential to the lack of validity of

2 HCCA's asserted lien; (c) facts and issues related to the unlawful conversion of the

3 District's property, including medical supplies and equipment; (d) facts and issues

4 related to the unauthorized Celtic Transaction and the misappropriation of the proceeds

5 from the sale of the District's assets in the Celtic Transaction at issue in Adversary

6 Proceeding No. 18-01008; (e) multiple additional claims the District states against

7 HCCA based on facts alleged in the both of the above-referenced adversary

8 proceedings.[15]

9 **III.    ARGUMENT**

10        One of the central goals of bankruptcy is to "centralize all disputes concerning

11 property of the debtor's estate so that reorganization can proceed efficiently, unimpeded

12 by uncoordinated proceedings in other arenas." *Kismet Acquisition, LLC v. Icenhower*

13 *(In re Icenhower)*, 757 F.3d 1044, 1051 (9th Cir. 2014).[16] *See also, In re Eber*, 687 F.3d

14 1123, 1131 (9th Cir. 2012) ("One of the Bankruptcy Code's primary objectives is

15 "centralization of disputes concerning a debtor's legal obligations."); H.R. Rep. No. 95-

16 595, at 340, reprinted in part in 1978 U.S.C.C.A.N. 5787, 6297.

17

18      **A.    This Court Has Jurisdiction and Is The Proper Forum to Adjudicate
        the Lawsuit**

19        The constitutional basis of federal court subject matter jurisdiction of bankruptcy

20 cases arises under Article 1, § 8 of the Constitution.  Article 1, § 8 of the Constitution

21 provides Congress with the power to establish "uniform laws on the subject of

22 bankruptcies throughout the United States." Congress has done so by, among other

23 things, enacting title 11 of the United States Code as well as subsections 1334(a), (b)

24 and (e) of title 28 of United States Code, which establish the original subject matter

25 jurisdiction of the federal district courts over title 11 cases, civil proceedings in title 11

26

27 [15] It should be noted that since the counterclaim was filed the District has uncovered additional claims
against HCCA that will also be at issue at the trial of these disputes.

28 [16] In a chapter 9 case, property of the estate means property of the debtor. 11 U.S.C. §902(1).

Opposition of Tulare Local Healthcare District to Motion to            M:\S-U\TRMC\PLEADINGS\OHS-1 Motion to
Remand Lawsuit to State Court                                         Remand\oppo.031918.gaa.V3.docx

cases and property of the title 11 estate. 28 U.S.C. §1334. Congress also enacted 28

U.S.C. §157(a) which provides that "[e]ach district court may provide that any and all

cases under title 11 and any or all proceedings arising under title 11 or arising in or

related to a case under title 11 shall be referred to the bankruptcy judges for the

district." This referral of power to the bankruptcy court from the district court does not

involve questions of federal subject matter jurisdiction and, instead, bankruptcy court

jurisdiction is simply a direct extension of the district court's jurisdiction. *Assoc. of*

*Retired Employees. v. City of Stockton (In re City of Stockton)*, 478 B.R. 8 (Bankr. E.D.

Cal. 2012)("Stockton")(bankruptcy court exercises § 1334 jurisdiction as a "unit" of the

district court); *S & S Food Corp. v. Sherali (In re Sherali)*, 490 B.R. 104 (Bankr. N.D.

Tex. Mar. 14, 2013)(subject matter jurisdiction over bankruptcy cases to the district

court by 28 U.S.C. § 1334 and bankruptcy courts are granted certain authority by the

district courts under 28 U.S.C. §157). In other words, the bankruptcy court holds the

same jurisdiction as the district court.

     "The allocation of authority as between district judges and bankruptcy judges is

governed by 28 U.S.C. § 157." *Stockton*, 478 B.R. at 27. 28 U.S.C. § 157(b)(1) provides

that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core

proceedings arising under title 11, or arising in a case under title 11, referred under

subsection (a) of this section, and may enter appropriate orders and judgments, subject

to review under section 158 of this title." Core proceedings include, but are not limited

to: (a) matters concerning the administration of the estate, (b) the allowance or

disallowance of claims, (c) counterclaims by the estate against persons filing claims

against the estate, (d) determinations of the validity, extent and priority of liens, and (e)

other proceedings affecting the adjustment of the debtor-creditor relationship. 28 U.S.C.

§ 157(b)(2)(A),(B),(C),(K), and (O). Bankruptcy judges may also hear proceedings that

are not core proceedings but are otherwise "related to" a case under title 11, and submit

Opposition of Tulare Local Healthcare District to Motion to
Remand Lawsuit to State Court

M:\S-U\TRMC\PLEADINGS\OHS-1 Motion to
Remand\oppo.031918.gaa.V3.docx

1    proposed findings of fact and conclusions of law to the district court for the entry of any

2    final order or judgment. 28 U.S.C. §157(c)(1).

3         In the *Stockton* case, an association of retirees and individual retirees ("retirees")

4    filed an adversary proceeding against the City of Stockton and asserted a claim based

5    on modifications made to contractual benefits due to retirees. *Stockton*, 478 B.R. at 13.

6    The court determined that the retirees were "creditors" who had "claims" against the

7    debtor based on the definitions of the terms "creditor" and "claim" in the Bankruptcy

8    Code. *Id.* at 39. The *Stockton* court determined that the dispute between the Stockton

9    and the retirees "comfortably fit" within the "arises in" category under 28 U.S.C. §

10   1334(b) because it involved the "debtor-creditor relationship" and calls into question the

11   "enforceability" of bankruptcy doctrines. *Id.* at 29. The Stockton court also determined

12   that the dispute was a "core proceeding" under 28 U.S.C. § 157(b)(2)(B) because "the

13   determination that the plaintiffs are 'creditors' who have 'claims' against the debtor

14   implicates core proceeding status regarding 'allowance or disallowance of claims' of

15   creditors." *Id*. Importantly, the *Stockton* court reasoned that:

16        "This chapter 9 involves the adjustment of financial relations between the

17        City and all of its creditors, including the plaintiffs, in a process that will

18        culminate in a chapter 9 plan of adjustment. As such, this proceeding that

19        focuses on the relationship between debtor City and creditor plaintiffs is a

20        core proceeding as an "other proceeding" affecting the "adjustment of the

21        debtor-creditor or the equity security holder relationship." (citations

22        omitted). *Id*. at 29-30.

23        In this case, HCCA is a "creditor" of the District. First, HCCA is a creditor

24   because it has alleged claims against the District in the Lawsuit. Second, HCCA is also

25   a creditor because it filed a Notice of Secured Claim in this chapter 9 case through

26   which it asserts that its claim is secured by a "security interest in accounts receivable

27   generated" by the District "on or before the petition date and in the proceeds of those

28

1  accounts, including but not limited to funds deposited into the District's accounts at the

2  Bank of Sierra. Dkt No. 204. In addition, the District's Eleventh Counterclaim against

3  HCCA directly arises under Bankruptcy Code §§ 510 and 105. Furthermore, HCCA

4  claims a security interest in property of the District by virtue of the Deed of Trust which

5  is at issue in the District's counterclaim.[17] Therefore, just like in the *Stockton* case, the

6  matters at issue in the Lawsuit constitute a "core proceeding" and fall comfortably within

7  the "arising in" category under 28 U.S.C. § 1334(b) because it involves the "debtor-

8  creditor relationship" and calls into question the enforceability of bankruptcy doctrines.

9         This adversary proceeding is also a core proceeding under 28 U.S.C. §

10  157(b)(2)(B) because HCCA is a creditor that asserts a claim against the District which

11  "implicates core proceeding status regarding 'allowance or disallowance of claims'" just

12  like in the *Stockton* case. It is also a core proceeding because the facts establish that:

13  (a) it implicates matters concerning the administration of Property of the District; (b)

14  counterclaims by the District against HCCA asserted in the instant adversary

15  proceeding; and (c) the extent and priority of any lien HCCA may have securing its

16  claim because it has put the District on notice that it claims a security interest in the

17  District's accounts receivable and the proceeds of such accounts in the District's bank

18  accounts at Bank of Sierra by reason of filing the Notice of Secured Claim, and HCCA

19  asserts a deed of trust against the District's real property (the Evolutions Plaza

20  property). It is also a core proceeding because it implicates the adjustment of the

21  debtor-creditor relationship. While HCCA filed a pleading stating that it does not

22  consent to this Court's entry of any final orders or judgment under Bankruptcy Rule

23  9027(e)(3) (Dkt No. 13), HCCA's "non-consent" does not require remand to the LA

24  Superior Court. Even if some of the District's counterclaims are held to be *Stern*

25  claims,[18] this Court has authority to hear such claims and then to submit proposed

26

---

27  [17] See, Dkt. No. 9 at pp. 9-10, ¶¶ 20-22; p 16, ¶ 64; pp. 18-19, ¶¶ 76-80.

[18] *Stern* claims are intermediary types of claims of the debtor that are not classified as core or non-core,
28  but as claims that bankruptcy courts have statutory, rather than constitutional authority to adjudicate.
*Stern v. Marshall*, 564 U.S. 462, 469, 131 S.Ct. 2594 (2011).

Opposition of Tulare Local Healthcare District to Motion to
Remand Lawsuit to State Court        M:\S-U\TRMC\PLEADINGS\OHS-1 Motion to
Remand\oppo.031918.gaa.V3.docx

findings of fact and conclusions of law to the District Court for the Eastern District of California for the entry of any final order or judgment.[19]

### B. Direct Removal to the Bankruptcy Court Does Not Deprive this Court of Jurisdiction

HCCA contends that this Court does not have jurisdiction because the District allegedly violated 28 U.S.C. § 1452 by removing the Lawsuit directly to this Court. This argument is without merit. Even assuming, *arguendo*, that the District did not technically comply with 28 U.S.C. § 1452 by removing the Lawsuit first to the District Court for the Central District of California (which automatically refers cases to the Bankruptcy Court under General Order 13-05) and then filing a motion to transfer venue to this Court, this situation presents only a procedural issue of venue (not a question of subject matter jurisdiction). Although there is a split within the federal circuits on this issue with no controlling Ninth Circuit law, the majority of circuits have found that removal directly to a bankruptcy court is a procedural defect having no effect on jurisdiction. *Peterson v. BMI Refractories*, 124 F.3d 1386, 1388 (11th Cir. 1997) (failure to comply with geographic requirements does not deprive court of subject matter jurisdiction); *Cambridge Co. v. Cotton (In re Trafficwatch),* 138 B.R. 841 (Bankr. E.D. Tex. 1992 (removal from a state court located in the Northern District of Texas to a bankruptcy court in the Eastern District was a defect of venue, not jurisdiction).

Further, at least one Ninth Circuit bankruptcy court has decided this issue, siding with the majority positions in *Peterson* and *Trafficwatch*. *In re Bisno*, 433 B.R. 753 (Bankr. C.D. Cal. 2010). Although the court in *Bisno* ultimately remanded the adversary proceeding at issue, it did so only after finding that <u>a defect in removal procedure did not deprive the district court of jurisdiction</u>, but that equitable grounds for remand existed under 28 U.S.C. § 1452(b). *Bisno*, 433 B.R. at 758 (citing compelling evidence to remand

---

[19] Even assuming, *arguendo*, the Court were to determine that the claims adversary proceeding is not a core-proceeding (which it is), it most certainly is a non-core proceeding because it is related to the District's chapter 9 case.

-21-

existed based on inference that debtor filed bankruptcy in bad faith and concerns regarding judicial economy).

The *Bisno* opinion explains the split in authority on this issue as follows:

> "The majority view is that removal to the wrong federal court is a venue problem, not a jurisdictional problem. For example, in *Peterson v. BMI Refractories*, 124 F.3d 1386, 1388 (11th Cir. 1997), the court held that, "failure to comply with the geographic requirements of 28 U.S.C. § 1441(a) [the general federal removal statute] is a procedural defect that does not deprive a district court of subject matter jurisdiction in a removed case. *Peterson* involved a civil rights case removed from the Middle District of Alabama to the district court in the Northern District.
>
> Similarly, in *Cambridge Co. v. Cotton (In re Trafficwatch)*, 138 B.R. 841 (Bankr. E.D. Tex. 1992), the bankruptcy court found that removal from a state court located in the Northern District of Texas to a bankruptcy court in the Eastern District was a defect of venue, not jurisdiction.
>
> By contrast, in *Furr v. Barnett Bank, In re S & K Air Power, Inc.*, 166 B.R. 193, 195 (Bankr. S.D. Fla 1994), the bankruptcy Court held that removal to the Southern District of Florida from a state court located in the Middle District of Florida was improper, and that it had no jurisdiction over the case. In deciding this case, the court followed the prior Eleventh Circuit case, *National Developers, Inc. v. Ciba-Geigy (In re National Developers, Inc.)*, 803 F.2d 616 (11th Cir. 1986), where the court held that removal from a state court in New York to the Middle District of Alabama was improper because it violated the removal procedure of 28 U.S.C. 1478(a), the predecessor to § 1452. Id. at *758 620. Although the Court noted that direct removal to the court where the bankruptcy case was pending would be a more efficient procedure, this procedure was not permitted by the statute. Id. However, in *Peterson* the Eleventh Circuit held that *National Developers* was confined to its particular facts, which presumably included that it was based on a subsequently repealed statute. Thus, it appears that *S & KA Air Power* is no longer good law."

HCCA relies heavily on *Nat'l Developers* for its argument that removal direct to the bankruptcy court deprives this Court of jurisdiction. However, HCCA's reliance on *Nat'l Developers* is misplaced because that decision is predicated on a repealed statute,

-22-

and subsequent decisions by the Eleventh Circuit Court of Appeals and a bankruptcy court in the Central District of California have determined that the technical requirements of removal statutes are procedural issues of venue, not jurisdictional. *Bisno,* 433 B.R. at 758; *Peterson*, 124 F.3d at 1388.

The *Peterson* decision illustrates the problematic reasoning of *Nat'l Developers* by noting that "[t]he Supreme Court has long treated the technical requirements of the federal removal statutes as procedural, not jurisdictional,"[20] that where the requirements of a general venue statute are not satisfied the district court is not deprived of jurisdiction,[21] that it is basic law that removal proceedings are in the nature of process and that mere modal or procedural defects are not jurisdictional,[22] and that defects "are completely without effect upon the removal, if the case is in its nature removable."[23]

For these reasons, *Peterson* disapproves of the *Nat'l Developers* decision and it should not be followed here as is noted in the *Bisno* decision. While HCCA attempts to downplay this reality by stating that the *Peterson* court noted that *Nat'l Developers* "remains the law of this circuit with respect to the bankruptcy removal statute," HCCA's argument is not supported by the *Peterson* decision.  In fact, the *Peterson* court simply pointed out that the bankruptcy removal statute was not at issue in that particular case and, therefore, declined to extend the reasoning of *Nat'l Developers* beyond the bankruptcy context,  and that it would instead follow the reasoning set forth in *Mackay*, *Polizzi*, and *Covington*, as cited previously in n.1-4.  For these reasons, the District's

---

[20] *Peterson*, *citing Mackay v. Uinta Development Co.*, 229 U.S. 173, 33 S. Ct. 638, 57 L. Ed. 1138 (1913)(further stating that "Mackay is an old case but has never been overruled).
[21] *Peterson*, *citing Polizzi v. Cowels Magazines, Inc.*, 345 U.S. 663, 73 S. Ct. 900, 97 L. Ed. 1331 (1953).
[22] *Peterson*, *citing Covington v. Indemnity Ins. Co. of North America*, 251 F. 2d 930, 932-33 (5th Cir. 1958).
[23] *Id.*

Opposition of Tulare Local Healthcare District to Motion to Remand Lawsuit to State Court

M:\S-U\TRMC\PLEADINGS\OHS-1 Motion to Remand\oppo.031918.gaa.V3.docx

1  removal of the Lawsuit directly to this Court does not deprive the Court of jurisdiction and

2  the only issue is whether venue is proper in this court (which it is).

3  **C.  Remand Is Not Required By The Forum Selection Clause in the Rejected MSA**

4

5  HCCA argues that remand to the LA Superior Court is required by a forum

6  selection clause in the MSA. However, the Contract (of which the MSA was a part) was

7  rejected by virtue of this Court's Rejection Order. HCCA's Motion does not address the

8  effect of the Court's Rejection Order on the forum selection clause, and all of the cases

9  cited in the Motion are inapposite because they involve forum selection clauses outside

10 of bankruptcy proceedings. Thus, HCCA cites no applicable law to support its

11 argument. In fact, even if the MSA had not been rejected, the Ninth Circuit has held

12 that when an adversary proceeding is "core" and not inextricably linked with a non-core

13 proceeding, the public interest in centralizing bankruptcy proceedings outweighs the

14 interests in enforcing a forum selection clause. *In re Icenhower*, 757 F.3d 1044, 1051

15 (9th Cir. 2014) (bankruptcy court properly declined to enforce forum selection clause

16 where the proceeding was core and was not inextricably linked with a non-core

17 proceeding).

18  **D.  Any Right HCCA May Have to A Jury Trial Does Not Require Remand to the LA Superior Court**

19

20 HCCA argues that remand to the LA Superior Court is required because either it

21 has a right to a jury trial or the District has a right to a jury trial on its counterclaims

22 against HCCA. Neither scenario requires remand. First, HCCA arguably waived any

23 right it may have had to a jury trial by filing its Notice of Secured Claim.[24] Even if HCCA

24 did not waive any rights it may have to a jury trial, it is well settled that bankruptcy courts

25

26

27 [24] *See, e.g., Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (a litigant waives
   the right to a jury trial by filing a claim against the estate). The District submits HCCA's Notice of Secured
28 Claim is sufficiently akin to a proof of claim.

-24-

Opposition of Tulare Local Healthcare District to Motion to
Remand Lawsuit to State Court                    M:\S-U\TRMC\PLEADINGS\OHS-1 Motion to
                                                 Remand\oppo.031918.gaa.V3.docx

can adjudicate matters even where a party may be entitled to a jury trial. *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775 (9th Cir. 2007). In that case, the Ninth Circuit explained that even in cases where trial is required to be held in the district court (*e.g.* on personal injury tort claims or claims entitled to a jury trial), the district court need not assume jurisdiction of the matter because the bankruptcy court may handle all pre-trial matters, including entering dispositive orders on motions to dismiss or motions for summary judgment. "Even if a bankruptcy court were to rule on a dispositive motion, it would not affect a party's Seventh Amendment right to a jury trial, as these motions merely address whether trial is necessary at all. *Id.* at 788. Moreover, "requiring that an action be immediately transferred to [the] district court simply because of a jury trial right would run counter to our bankruptcy system," a system that "promotes judicial economy and efficiency by making use of the bankruptcy courts unique knowledge of Title 11 and familiarity with the actions before them." *Id.* at 787-88. "**Only by allowing the bankruptcy court to retain jurisdiction over the action until trial is actually ready do we ensure that our bankruptcy system is carried out.**" *Id.* at 788 (emphasis added). Under the holding in the *Sigma Micro* case, the bankruptcy court can preside over the case until the case is ready to go out for a jury trial in the District Court for the Eastern District of California - Fresno Division, the judicial district where the wrongs were committed.

### E. The Existence of State Law Issues Does Not Require Remand to the LA Superior Court

HCCA argues that remand is required because "state law issues predominate" in the Lawsuit and "pertain to the contractual relationship" between the District and HCCA "under which HCCA operated the Hospital." Even if a majority of the claims and counterclaims at issue in the Lawsuit involve the application of California law, this factor does not require or militate in favor of remand. Based on the voluminous pleadings and declarations filed in connection with the District's motion to reject the Contract which

dealt extensively with HCCA's management of the Hospital and the terms of the MSA (as well as the multiple hearings on the rejection motion), this Court has gained an extensive understanding of the issues in the Lawsuit and is perfectly capable of applying California law to adjudicate HCCA's contract and declaratory relief claims and the District's counterclaims alleged in the Lawsuit.  In fact, the United States Supreme Court has recognized that claims allowance process "requires bankruptcy courts to consult state law in determining the validity of most claims." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 444, 127 S. Ct. 1199, 1201 (2007).  In contrast, there has been no activity whatsoever in the LA Superior Court because the Lawsuit was stayed within 15 days after it was filed.

In fact, the matters in the Lawsuit involves facts and issues central to this chapter 9 case and at least two other pending adversary proceedings.   For example, in Adversary Proceeding No. 18-01005, matters at issue include the existence and amount of any claim HCCA may have under the promissory notes referenced in the Deed of Trust which is at issue in the complaint in the Lawsuit and the District's counterclaim that the Deed of Trust was unauthorized and should be cancelled which relates to the lack of  validity of HCCA's asserted lien.

For another example, there are many matters that relate to the administration of the bankruptcy case and the debtor creditor relationship which include, but are not limited to, the adjudication of facts and issues related to any claim HCCA may have against the District for allegedly breaching the Contract, the scope of any security interest in the District's accounts asserted by HCCA in its Notice of Secured Claim and whether HCCA lawfully deemed itself "insecure" under the Contract; whether HCCA's claim should be equitably subordinated; HCCA's conversion of the District's property, including medical supplies and equipment, and other matters.

Further, there are matters related to the adjudication of facts and issues in Adversary Proceeding No. 18-01008 respecting the events surrounding the election of

-26-

1   Northcraft and Jamaica to the Board, the recall election in which Gutierrez was elected

2   to the Board and the authority or lack thereof to borrow funds or sell District assets in

3   connection with the Celtic Transaction, and the misappropriation of the proceeds from

4   the sale of the District's assets in the Celtic Transaction.  In light of the foregoing, the

5   efficient administration of this case and furthering the important primary objective and

6   purpose of the Bankruptcy Code of resolving disputes concerning a debtor's obligations

7   to its creditors in the centralized forum of a bankruptcy court is paramount.

8

9   **F.     Equitable and Efficiency Factors Militate In Favor of the Lawsuit *Not* Being Remanded**

10  HCCA argues that there was no jurisdictional basis other than 28 U.S.C. §1334

11  when the Lawsuit was removed. HCCA appears to predicate its argument on the fact

12  that the District's counterclaim was filed in this Court on the same day that the District

13  filed the Notice of Removal, rather than being first filed in the LA Superior Court

14  seconds before the District filed the Notice of Removal.  This argument is without merit.

15  Under  HCCA's logic, jurisdiction under 28 U.S.C. §1334 is predicated on timing.  It is

16  not. The simple fact is that the District's counterclaim alleges a claim for equitable

17  subordination under 11 U.S.C. §§ 105(a) and 510(b) (and involves other matters that

18  confer core proceeding status).  It is of no moment whether the District's counterclaims

19  were asserted in a cross-complaint filed in LA Superior Court or the District's

20  counterclaim in this Court.

21  HCCA next argues that the Lawsuit is based entirely on state law claims and no

22  core bankruptcy matters and, therefore, it is not feasible to sever the state law claims

23  from core bankruptcy matters.  As set forth in Section A above, this argument lacks

24  merit because HCCA's claims fall within the types of matters that are core proceedings

25  and, in any event, this Court can hear and preside over any *Stern* claims in the District's

26  counterclaim and then submit proposed findings of fact and conclusions of law to the

27  District Court for the Eastern District of California - Fresno Division for the entry of any

28

-27-

1 | final order or judgment and make recommendations.

2 |       HCCA also asserts that remand will reduce the burden on the Court's docket and

3 | the Court is burdened because it is "already overseeing a contentious and complicated

4 | chapter 9 case." The only creditor that has made the District's chapter 9 case

5 | contentious and complicated is HCCA.  There is substantial overlap of the facts and

6 | legal issues between the Lawsuit and the two adversary proceedings pending in this

7 | Court as explained in Section III E above. The Lawsuit should not be remanded to the

8 | LA Superior Court because doing so will only be inefficient, duplicate the time, cost and

9 | expense of litigating the facts and legal issues in a non-bankruptcy forum that has no

10 | familiarity with the facts and issues, and risk the possibility of inconsistent factual

11 | findings and legal decisions on the same issues in the Lawsuit and Adversary

12 | Proceeding Nos. 18-01005 and 18-01008 pending in this Court.

13 |       HCCA further asserts that the District commenced its chapter 9 case in order to

14 | forum shop and then remove the Lawsuit to this Court.  That argument is not credible.

15 | First, based on the facts set forth above, the District was pushed into insolvency under

16 | HCCA's management and forced into bankruptcy due to HCCA's threats to close the

17 | Hospital.  Second, a chapter 9 proceeding is extremely expensive and obviously not

18 | something any municipality would file merely to "forum shop."  Third and most

19 | significantly, HCCA's own "evidence" undermines its argument. HCCA points to

20 | "evidence" of the District's alleged forum shopping in statements reportedly made by

21 | Northcraft on July 30, 2016, over 14 months before HCCA even commenced the

22 | Lawsuit. *See*, Motion at p. 10, lns. 13-19 citing Dkt No. 4, pp. 15-16 (at 6:26-7:1).[25]

23 | HCCA fails to explain how Northcraft's alleged statements constitute forum shopping

24 | when HCCA concedes such statements were made approximately 4 months before

25 | Northcraft was elected to the Board, roughly 13-1/2 months before the Lawsuit was

26 | even filed and nearly 14 months before HCCA even told the Board that the District was

27 |

28 | [25] The pleading cited by HCCA are allegations made in is its own Complaint commencing the Lawsuit.

1  in a dire fiscal crisis and HCCA threatened to close the Hospital.

2      HCCA's assertion that "non-debtor" parties will be present in the Lawsuit is not

3  supported by any facts. The naming of "Doe Defendants" is standard practice in state

4  court complaints, and HCCA has not identified any non-Debtor party that "will be

5  present in the Lawsuit."

6      Last, the District notes that if the Lawsuit were to be remanded to the LA

7  Superior Court HCCA would need to seek and obtain relief from stay to proceed with

8  the Lawsuit.  Upon entry of the order lifting the stay the District will have 30 days to

9  again remove the Lawsuit to the Central District, Los Angeles Division, which will refer

10 the Lawsuit to the Bankruptcy Court for that district and division to hear the District's

11 motion to transfer the Lawsuit to this Court, in the district and division where the

12 disputed claims and counterclaims arose.  Judicial economy and efficiency are

13 equitable factors that militate against removal.  The fight began in this judicial district

14 and it should be heard here.

15 **IV.    CONCLUSION**

16     For the foregoing reasons, the District respectfully requests that the Motion be

17 denied and that it have such other relief as is just and proper.

18 Dated: March 29, 2018                WALTER WILHELM LAW GROUP,
19                                      a Professional Corporation

20                              By:    _____
21                                     Riley C. Walter
                                       Attorneys for Debtor Tulare Local Healthcare
22                                     District, dba Tulare Regional Medical Center

23

24

25

26

27

28
                                         -29-